❑ Original          ❑ Duplicate Original

# UNITED STATES DISTRICT COURT

for the

Eastern District of Wisconsin

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br>location information associated with the<br>telephone assigned call number ending x7398 | )<br>)<br>)   Case No.  25-915M(NJ)<br>)<br>)<br>) |

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the _____ Eastern _____ District of _____ Wisconsin _____
*(identify the person or describe the property to be searched and give its location)*:

See Attachment A.

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment B.

**YOU ARE COMMANDED** to execute this warrant on or before _____ 6/2/2025 _____ *(not to exceed 14 days)*

❑ in the daytime 6:00 a.m. to 10:00 p.m.    ☑ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to _____ Nancy Joseph _____.
*(United States Magistrate Judge)*

☑ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial) and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*

☑ for __30__ days *(not to exceed 30)*  ❑ until, the facts justifying, the later specific date of _____.

Date and time issued:  5/19/2025 @ 12:29 p.m.          *Nancy Joseph* (signature)

_____
*Judge's signature*

City and state:  Milwaukee, WI          Nancy Joseph
_____
*Printed name and title*

| **Return** | | |
|---|---|---|
| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |

Inventory made in the presence of :

Inventory of the property taken and name(s) of any person(s) seized:

**Certification**

      I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

# ATTACHMENT A

**Property to Be Searched**

1. Records and information associated with the cellular device assigned (385) 466-7398 (referred to herein and in Attachment B as "the Target Cellular Device") that is in the custody or control of Verizon (referred to herein and in Attachment B as the "Service Provider" or the "Provider"), a wireless communications service provider that is located at 180 Washington Valley Road, Bedminster NJ.

2. The Target Cellular Device.

## ATTACHMENT B

**Particular Things to Be Seized from Device Service Provider**

To the extent that the information described in Attachment A is within the possession, custody, or control of the Provider, including any information that has been deleted but is still available to the Provider or that has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), the Provider is required to disclose to the government the following information pertaining to the Account listed in Attachment A:

    a.   The following subscriber and historical information about the customers or subscribers associated with the Target Cellular Device for the time period January 1, 2024, to PRESENT:

        i.   Names (including subscriber names, user names, and screen names);

        ii.   Addresses (including mailing addresses, residential addresses, business addresses, and e-mail addresses);

        iii.   Local and long distance telephone connection records;

        iv.   Records of session times and durations, and the temporarily assigned network addresses (such as Internet Protocol ("IP") addresses) associated with those sessions;

        v.   Length of service (including start date) and types of service utilized;

        vi.   Telephone or instrument numbers (including MAC addresses, Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifier ("MEID"); Mobile Identification Number ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"); International Mobile Subscriber Identity Identifiers ("IMSI"), or International Mobile Equipment Identities ("IMEI");

        vii.   Other subscriber numbers or identities (including the registration Internet Protocol ("IP") address);

        viii.   All subscriber and extended subscriber information, handset identifiers, handset make and model, WI-FI MAC address, and account notes and

2

memos pursuant to Federal Rule of Criminal Procedure 41 and 18 U.S.C. §2703(c).

    ix. Means and source of payment for such service (including any credit card or bank account number) and billing records; and

    x. All records and other information (not including the contents of communications) relating to wire and electronic communications sent or received by the Target Cellular Device, including:

        (A) Call detail records and data reports with cell site location information for voice, SMS, MMS, and data connections, originating and destination IP addresses, and specialized location data including timing advance, RTT, LOCDBOR, or equivalent pursuant to Federal Rule of Criminal Procedure 41 and 18 U.S.C. §2703(c); and

        (ii) information regarding the cell tower and antenna face (also known as "sectors" through which the communications were sent and received)

b. Information associated with each communication to and from the Target Cellular Device for a period of 30 days from the date of this warrant, including:

    i. Any unique identifiers associated with the cellular device, including ESN, MEIN, MSISDN, IMSI, SIM, or MIN;

    ii. Source and destination telephone numbers;

    iii. Date, time, and duration of communication; and

    iv. All data about the cell towers (i.e. antenna towers covering specific geographic areas) and sectors (i.e. faces of the towers) to which the Target Cellular Device will connect at the beginning and end of each communication

The Court has also issued an order pursuant to 18 U.S.C. § 3123, dated today, for such information associated with the Target Cellular Device.

c. Information about the location of the Target Cellular Device for a period of 30 days, during all times of day and night. "Information about the location of the Subject Phone" includes all available E-911 Phase II data, GPS data, latitude-longitude data, and other precise location information.

    i. To the extent that the information described in the previous paragraph (hereinafter, "Location Information") is within the possession, custody, or

control of the Provider, the Provider is required to disclose the Location Information to the government. In addition, the Provider must furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the Location Information unobtrusively and with a minimum of interference with the Provider's services, including by initiating a signal to determine the location of the Target Cellular Device on the Provider's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government shall compensate the Provider for reasonable expenses incurred in furnishing such facilities or assistance.

ii. Information about the target cellular device and its location, later referred to collectively as location information, includes all precision location information, E-911 Phase II data, GPS data, latitude-longitude data, specialized location data including timing advance, RTT, LOCDBOR, or equivalent, and real time cell site information for 30 days beginning from the date the warrant was issued. This includes initiating a signal to determine the location of the Target Cellular Device on the service provider's network or with such other reference points as may be reasonably available and at such intervals and times directed by the government. The information includes monitoring non-content signaling and routing information, including all non-content packet switched data, through the furnishing of information, facilities, technical assistance, and the installation and use of a pen register and trap and trace device pursuant to 18 U.S.C. §§ 3123-3124 by the service provider and the Federal Bureau of Investigation. Because the request for such location data may include use of a "pen register" or a "trap and trace device," see 18 U.S.C. § 3127(3) & (4), the application and the warrant are designed to comply with the Pen Register Statute as well as Rule 41. The application therefore includes all information required for and serves as a pen register application, 18 U.S.C. § 3123(a); similarly, the warrant therefore includes all the information required for and serves as a pen register order, 18 U.S.C. § 3123(b).

iii. This pen register / trap and trace device shall be transferable to any changed dialed number subsequently assigned to a device bearing the same ESN, IMSI, or SIM as the Target Cellular Device; any changed ESN, IMSI, or SIM subsequently assigned the same dialed number as the Target Cellular Device; or any additional changed dialed number, ESN, IMSI, or SIM listed to the same subscriber account as the Target Cellular Device.

d. The government shall compensate the service provider for reasonable expenses incurred in furnishing such facilities or assistance. Any service provider or

4

representative who gains access to the information in this warrant shall not disclose the existence of the warrant, order, or investigation to any third party unless ordered to do so by the Court. Additionally, the agency requests that all court orders and supporting documents, including the affidavit and search warrant, be sealed until further order by the Court.

e. This warrant does not authorize the seizure of any tangible property. In approving this warrant, the Court finds reasonable necessity for the seizure of the Location Information. *See* 18 U.S.C. § 3103a(b)(2).

## II. Information to be Seized by the Government

All information described above in Section I that will assist in the investigation of (385)-466-7398 regarding violations of 18 U.S.C. § 922(o) (Unlawful possession of Machinegun), 26 U.S.C. § 5861(a) (Engaging in the Business of Dealing in NFA Firearms), 21 U.S.C. § 841 (distribution of controlled substances) and 18 U.S.C. § 371 (Conspiracy to Violate the laws of the United States) between January 1, 2024, and the present.

Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) are authorized to review the records produced by the Provider in order to locate the things particularly described in this Warrant.

5

# UNITED STATES DISTRICT COURT

for the

Eastern District of Wisconsin

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>location information associated with the<br>telephone assigned call number ending x7398 | )<br>)<br>)<br>)<br>)<br>)   Case No. 25-915M(NJ) |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

see Attachment A

located in the _____ Eastern _____ District of _____ Wisconsin _____ , there is now concealed *(identify the person or describe the property to be seized)*:

see Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 USC §§ 371, 922(o); 26<br>USC § 5861(a); 21 USC 841 | conspiracy; unlawful possession of machine gun; distribution of controlled<br>substances; unlawful firearms dealing |

The application is based on these facts:

see attached Affidavit

☑ Continued on the attached sheet.

☑ Delayed notice of __30__ days *(give exact ending date if more than 30 days: _____ )* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

Matthew Bammert    Digitally signed by Matthew Bammert
Date: 2025.05.16 09:15:06 -05'00'

*Applicant's signature*

ATF SA Matthew Bammert

*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
_____ telephone _____ *(specify reliable electronic means)*.

Date: __5/19/2025__

*Judge's signature*

City and state: __Milwaukee, WI__     Honorable Nancy Joseph, U.S. Magistrate Court

*Printed name and title*

# AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT

I, Special Agent Matthew Bammert, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1)      I make this affidavit in support of an application for a search warrant under Federal Rule of Criminal Procedure 41 and 18 U.S.C. §§ 2703(c)(1)(A) for information about the location of the cellular telephone assigned call number (385) 466-7398 (the "Target Cellular Device"). This information is in the custody or control of Verizon, a wireless telephone service provider located at 180 Washington Valley Road, Bedminster NJ ("Service Provider"). The Target Device is described herein and in Attachment A, and the location information to be seized is described herein and in Attachment B.

2)      The Court has jurisdiction to issue the proposed warrant because it is a "court of competent jurisdiction" as defined in 18 U.S.C. § 2711. Specifically, the Court is a district court of the United States that has jurisdiction over the offense being investigated, see 18 U.S.C. § 2711(3)(A)(i).

3)      Because this warrant seeks the prospective collection of information, including cell-site location information, that may fall within the statutory definitions of information collected by a "pen register" and/or "trap and trace device," *see* 18 U.S.C. § 3127(3) & (4), the requested warrant is designed to also comply with the Pen Register Act. *See* 18 U.S.C. §§ 3121-3127.  The requested warrant therefore includes all the information required to be included in an order pursuant to that statute. *See* 18 U.S.C. § 3123(b)(1).

4)      I am a Special Agent of the United States Justice Department, Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"), currently assigned to the Milwaukee Field Office. I

have been so employed since December 2023. Prior to ATF I was employed as a Police Office for the United States Secret Service Uniform Division for a little over 5 years. I also have a Bachelor of Science Degree in Policial Science Pre Law from Northern Michigan University.

5) Through my law enforcement career, I have attended 4 separate training academies. For ATF I have completed approximately 26 weeks of training at the Federal Law Enforcement Training Center (Glynco, Georgia) and ATF's National Academy. The training included courses on constitutional law such as search and seizure, and conducting investigations through searches, arrests, interviews, surveillance, and evidence collection. The training also included firearms trafficking, drug trafficking, and firearms recognition. It covered an in depth break down of the requirements to possess, manufacture, deal, sell, and transfer National Firearms Act ("NFA") weapons and requirements for selling, dealing, and manufacturing firearms.

6) I have investigated federal firearms violations to include the trafficking, manufacturing and illegal possession of firearms, to include investigations into violations of 18 U.S.C. § 922(o) (Unlawful possession of Machinegun) and multiple different violations of the National Firearms Act. I know from training and experience that those that commit crimes commonly communicate, photograph, videotape, and organize using electronic devices, including by phone call, text message, electronic mail, messaging application, and social media.

7) I have participated in numerous investigations in which electronic devices, to include phones, computers and tablets, have been seized and analyzed. I have participated in investigations in which location data has been used to identify targets, map pattern of travel, corroborate evidence, and arrest targets. During the course of my investigations, I have used electronic data and evidence to identify parties to the crime, the commission of criminal offense and identify the intent, motive, manner and means.

2

8)      The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter. Descriptions of conversations below are not verbatim; at times, I have paraphrased and excerpted portions for clarity.

9)      Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of 18 U.S.C. § 922(o) (Unlawful possession of Machinegun), 21 U.S.C. § 841 (distribution of controlled substances), 26 U.S.C. § 5861(a) (Engaging in the Business of Dealing in NFA Firearms) and 18 U.S.C. § 371 (Conspiracy to Defraud the Government) have been committed by Irving ALANIS (W/M DOB 04/05/2003), and 18 U.S.C. § 922(o) (Unlawful possession of Machinegun), 26 U.S.C. § 5861(a) (Engaging in the Business of Dealing in NFA Firearms), 18 U.S.C. § 922(g)(1) (Possession of Firearm by a Convicted Felon) and 18 U.S.C. § 371 (Conspiracy to Violate the laws of the United States) have been committed by Alexander SILVA-ALVAREZ (W/M DOB 07/31/2003). There is also probable cause to search the information described in Attachment A for evidence of these crimes and contraband or fruits of these crimes, as described in Attachment B.

## PROBABLE CAUSE

10)      Beginning in January of 2025, ATF, in conjunction with Waukesha Police Department (WPD), began investigating Irving ALANIS for illegal possession of a machineguns and illegally selling machineguns. Waukesha Police Department Confidential Informant 25-4 (hereafter CI) provided information on ALANIS, which led ATF and WPD to start an investigation into him. CI has a criminal history that includes non-criminal disorderly conduct conviction. CI is currently working towards consideration on Possession with Intent THC charge

3

in Waukesha County and has received a one-time monetary compensation for work. Based on my experience with CI, my conversations with other agents about CI, and my work on this investigation to date, I believe CI to be truthful and reliable.

### Debrief of CI – January 21, 2025

11)     On January 21, 2025, ATF and WPD debriefed the CI where the CI provided information on an individual they know as "Millhouse". Law enforcement later identified "Millhouse" as Irving ALANIS using a known photograph of the same. The CI advised they have bought marijuana from ALANIS in the past, they know ALANIS to have sold marijuana for at least five years, and they know ALANIS to sell fully automatic AR pistols and Glocks with machinegun conversion devices (MCD) attached. They explained ALANIS would advertise these firearms for sale on a private Telegram group.

### First CI Buy From Irving ALANIS – January 30, 2025

12)     On January 22, 2025, the CI reached out to ALANIS, at phone number 385-466-7398 (Target Cellular Device), asking if ALANIS had a Glock with a button on it, to which ALANIS responds, let me ask my guy. Through training and experience I know that a button is referring to a machinegun conversion device that is put on the back of a Glock style pistol. On January 28, 2025, ALANIS told the CI that "He (referring to ALANIS' guy) got a 19x with a gold button for 1,250 obo," pictured below. ALANIS and the CI agreed to meet on January 30, 2025.



4

13) On January 29, 2025, ALANIS sent, via Target Cellular Device, the CI a photo of the firearm, that was later purchased, with ALANIS stating that he will put a gold button on it. These messages are pictured below.




14) On January 30, 2025, the CI asked ALANIS for an address to meet at. ALANIS provided, via Target Cellular Device, the CI an address of 3531 W Verona Ct Milwaukee, WI 53215. A law enforcement data base check shows that the residence of ALANIS is 4242 W Willow Way Milwaukee, WI 53211. This residence is less than one mile from the address ALANIS provided as the meet location for selling the CI the Glock with the MCD. WPD set up surveillance on 4242 W Willow Way prior to the deal.

15) At approximately 1420 hours, while doing surveillance at 4242 W Willow Way, WPD observed a male, wearing all black with a black mask, carrying a black bag, exit 4242 W Willow Way and enter a sedan, bearing Wisconsin registration AVH1119, pictured below. This individual was later identified as ALANIS. WI plate AVH1119 comes back registered as a Black

5

Nissan Altima, listed to an Armando Alanis with an address of 4242 W Willow Way, Milwaukee, WI.



16)  WPD followed the Altima until it reached the deal location. The Altima parked directly behind the CI's vehicle. At approximately 1424 hours, the CI exited their vehicle and approached the Altima. The CI entered ALANIS's Altima and sat in the front passenger seat. The CI, approximately 1 minute later, then exited the Altima and entered their vehicle. At approximately 1425 hours the deal was completed. ATF SAs and WPD followed the CI to a pre-designated location for a debrief.

17)  The CI stated they sent a text message to ALANIS stating he arrived at the buy location, and ALANIS replied, via Target Cellular Device, that he was near. The CI stated that ALANIS arrived in a black Nissan, and they got into ALANIS vehicle. CI stated ALANIS handed him the firearm, and CI handed ALANIS the money. They "dapped" (*referring to a street handshake*) each other up, and the CI left the vehicle. No conversation relating to the buy

6

occurred. The firearm that was purchased for $1,250 and was a GLOCK INC Model: 19 Caliber: 9 Type PISTOL S/N: AGTL281 with a gold and purple MCD attached pictured below.



18)     The CI stated they purchased the firearm from "Millhouse" and showed a photo of the person they bought from.  CI also confirmed that this was the same person they had purchased marijuana from multiple times in the past. The CI showed the photo, which is the same photo that ATF SA found on a Facebook profile for Irving ALANIS, pictured below.



19)     During the deal the CI was wired up with an audio and recording device. Review of video showed the CI getting out of their vehicle, getting into a different vehicle, known to be the Altima based off of law enforcement surveillance of the deal, the interior roof of the Altima, the CI getting out of the Altima and back in their vehicle and the firearm purchased in the CI vehicle. Review of the audio showed the CI and ALANIS greeting each other.

20)     During the aforementioned deal, the Milwaukee Police Department (MPD) was working surveillance on ALANIS's residence at 4242 W Willow Way Milwaukee, WI 53221 for a separate MPD case. MPD advised that they observed ALANIS leave the residence wearing all black with a black bag. SAs shared a photo with MPD that was taken by WPD while on surveillance at ALANIS residence, pictured below. MPD confirmed that they believed it was Irving ALANIS.  Members of MPD also stated that they had conducted surveillance on ALANIS multiple times in the past and knew him to drive the same Nissan vehicle he used to meet with the CI.



**Second CI Buy From Irving ALANIS –February 21, 2025**

21)     On February 7, 2025, the CI sent a text message to ALANIS asking about purchasing another full auto or a switch. ALANIS replied, via Target Cellular Device, that he can

8

see but that he did not have anything at that moment. On February 10, 2025, the CI sent a text message to ALANIS, on Target Cellular Device, asking if he had any controlled substances available to sell to the CI's uncle. ALANIS asked what the uncle was trying to buy and sent a message stating, "I gotta talk to primo first see if it's even worth sending him yall his way," pictured below. Through training and experience I know that individuals who sell in large quantities of narcotics do not want to waste their time selling small amounts to individuals because it is not financially worth it.



22)     On February 18, 2025, ALANIS sent a text message, via Target Cellular Device, to the CI about selling an FN509 for $1,200. ALANIS sent both a photo and details of accessories that would come with it. ALANIS also sent the CI a text message stating, "Might have another 19x with button" (pictured below). Based off the past deal the CI had with ALANIS and training and experience I know that 19x is referring to a Glock 19x pistol. Also, I know that the term "button" is referring to a machinegun conversion device.

9



23) Later that day on February 18, 2025, ALANIS, via Target Cellular Device, let the CI know that the Glock 19 with a switch was available and sent the CI a message saying "1250 same as lone one bro if you want it". CI and ALANIS agreed to meet on February 21, 2025, for the sale of that Glock with a switch (pictured below).



24)     On February 19, 2025, ALANIS, via Target Cellular Device, then sends a photo of the Glock 19 and then on February 20, 2025, ALANIS sent a message "Bet fam ima go get the thing installed today so it will be ready for tomorrow" (pictured below). I know that ALANIS is referring to the switch as the thing to be installed, based off the photo of the firearm he sent not having a switch on the back of it, wanting the firearm to be ready for tomorrow (date of the deal), and that he agreed to sell a Glock with a switch.



25)     At approximately 1255 hours, on the day of the deal, the CI's electronic recording device was activated at the pre-designated location and at approximately 1300 hours CI departed the pre-designated location en route to the agreed upon deal location of 2967 S 37th ST Ct Milwaukee, WI 53215. CI arrived at the deal location at approximately 1308 hours. During this drive the CI was under constant surveillance by ATF and WPD. While at the deal location WPD maintained surveillance of the CI during the deal.

11

26)     At approximately 1320 hours, WPD observed a sedan, bearing Wisconsin registration AVH-1119, pull up behind the CI's vehicle (pictured below). Wisconsin plate AVH-1119 comes back to a Nissan Altima and is the same vehicle ALANIS drove to the first buy between the CI and him. At approximately 1320 hours the CI exited their vehicle and approached the Altima. The CI entered the Altima and sat in the front passenger seat. Approximately 1 minute later the CI gets out of the Altima and gets back into their car and the Altima departs the deal location.



27)     At approximately 1321 hours the deal completed. ATF and WPD followed the CI from the deal location to the pre-designated location. ATF took possession of the firearm that was purchased for $1,250, pictured below. The CI and the CI's vehicle was searched again finding no contraband. The E/S was deactivated, and the CI was debriefed by ATF and WPD. The firearm purchased was a GLOCK GMBH; Model: 19X; Caliber: 9; Type: PISTOL; S/N: BTEF544 with a green MCD attached.

12



28)     During the debrief the CI stated ALANIS sent a text message, via Target Cellular Device, of meet location of 2967 S 37th ST Milwauee WI. The CI sent a text message that they arrived, and ALANIS sent a message back that he is on his way and that he was pulling up (All pictured below).



13

29)     The CI stated that during the deal ALANIS explained to the CI that he took off the larger back strap of the firearm off because the slide of the firearm was not going all the way forward and the switch was scratching it. ALANIS gave the larger back strap to the CI as part the of purchase.

30)     The CI also stated that they purchased from "Milhouse" and that it is the same individual they purchased from on the last deal. "Milhouse" has previously been identified as Irving ALANIS. CI also stated that ALANIS arrived in the same black Altima that he arrived in at the last deal. The CI explained that the individual they purchased from does not have any finger tattoos but does have a hand tattoo of the clown from the movie IT. I know from Facebook photos and profile pictures of Irving ALANIS that he does not have finger tattoos while his brother Armando Alanis does. A Facebook profile picture of Irving ALANIS shows the clown from the movie IT tattooed on his hand (pictured below).



14

31)     The CI also stated that during the deal they noticed that ALANIS had an additional firearm. This firearm was shoved in between the driver seat and center console. Through training and experience I know that individuals illegally dealing in firearms also will carry a firearm for their protection and that the location described by the CI is a common spot for these individuals to have their firearms.

32)     The CI was also shown photos that WPD took of Irving ALANIS when he got back to his residence after the deal (pictured below). The CI confirmed that this is the same individual they purchased from.



33)     Immediately following the completing of the deal Milwaukee Police Department (MPD) and ATF followed the Altima. The Altima drove back to 4242 W Willow Way Milwaukee WI, the residence of Irving ALANIS, and did not make any stops between the deal location and 4242 W Willow Way. WPD observed the Altima pull up to 4242 W Willow Way and ALANIS enter the residence.

34)     Review of audio and video that the CI used to record the buy confirms that ALANIS talks to the CI explaining why he took the larger back strap off the firearm he sold to the

15

CI. Video shows the handing off the firearm from the individual in the driver seat to the CI in the passenger seat. Due to the angle and lighting of the video recording the face of the individual was not shown clearly. However, we can say with certainty that this individual is ALANIS based off of surveillance seeing only ALANIS get in the Altima prior to the deal, the CI confirming only one person in the car, and surveillance observing the Altima leave the deal, go back to 4242 W Willow Way, and no one other than ALANIS get out of the Altima.

### Identification of Alexander SILVA-ALVAREZ

35)     On January 21, 2025, ATF, met with WPD and the CI at the WPD.  During this meeting, CI was familiar with a subject known as "Chuky" and a subject known as "Millhouse". The CI believed that the two were cousins with each other and stated that they both utilize Telegram Messenger to sell fully automatic firearms as well as non-fully automatic firearms.  The CI showed ATF and WPD the Telegram Messenger account "TheMenu" and stated that both "Chuky" and "Millhouse" use this account to sell firearms.

36)     On February 21, 2025, ATF and WPD met with the CI. The CI showed ATF and WPD posts from the Telegram Messenger page "TheMenu".  CI knows the person running the page to still be "Chuky".  Through the Telegram Messenger page, the CI was able to provide ATF and WPD with an Instagram account (solow1008), a Snapchat account (solowstashin24), and a phone number (414-870-3317).   Below are two photos taken from "TheMenu" Telegram Messenger page. It should be noted that one minute prior to the aforementioned post of the tan Glocks for sale, there is an advertisement for a Glock 19 with a "gold button" for $1,300.  Button is a common slang for a machine gun conversion device (MCD).

16

 

37) The CI recalled meeting Chuky in person one time approximately one year ago, at the Sphinx Vape and Smoke located at the intersection of S 76th St and W Howard Ave. The CI believed that Chuky was cousins with Irving ALANIS. The CI thought that Chuky was most likely the person that ALANIS is getting his firearms from that he has been advertising/selling to the CI. The CI showed ATF and WPD the Telegram Messenger page "TheMenu" and pointed to a recent listing for two different tan Glock handguns. The CI noted that the tan Glock without the threaded barrel extension looked very similar to the Glock that the CI arranged to purchase from ALANIS later that day.

38) Later on, February 21, 2025, the CI purchased a tan Glock pistol with a machine gun MCD affixed to the back from ALANIS. After the purchase was completed, the CI stated they received a notification on their phone from Telegram that said Channel Photo Not Visible. The CI noted that on "TheMenu" Telegram Messenger page the listing for the tan Glock was removed. Below is a photo of the "TheMenu" page with the photo no longer shown.

17



39)     On February 24, 2025, ATF conducted a law enforcement database check of the phone number 414-870-3317 and observed that it belongs to an Alexander SILVA-ALVAREZ. ATF also conducted a law enforcement database check of Alexander SILVA-ALVAREZ which showed that SILVA-ALVAREZ is a convicted felon with the most recent felony conviction from 2024. A check of Facebook showed an individual on there as "Solow Stashin". "Solow Stashin" is also friends with both of Irving ALANIS's Facebook pages as well as Armando ALANIS and Amairany ALANIS, who are all brothers and sisters. The CI was shown the profile photo from "Solow Stashin" Facebook page and the CI confirmed that that was "Chuky". A comparison of the Facebook photo of "Solow Stashin" to the Driver's License photo of SILVA-ALVAREZ and found that they appear to be the same person. It is also noted that in the Facebook profile photo of "Solow Stashin" he is holding a large stack of U.S. currency. The stack of currency matches the same stack of U.S. currency that is shown in the profile picture of the Telegram Messenger page "TheMenu". In the Facebook photo SILVA-ALVAREZ is wearing sunglasses with diamonds over the bridge of the nose. In the "TheMenu" Telegram Messenger page the subject in

18

the photo is holding the same style sunglasses. In both photos the subject appears to be wearing the same black shirt. Below is a side-by-side comparison of the photos.

 

Telegram Messenger "TheMenu"               "Solow Stashin" Facebook Photo

40)     When comparing in Google Maps the listed address of SILVA-ALVAREZ, 4331 S 76th St. Milwaukee WI, to that of the Sphinx Vape and Smoke where the CI met SILVA-ALVAREZ, it shows that they are approximately 0.5 miles from each other.

**First CI Buy from Alexander SILVA-ALVAREZ/ Third Buy from Irving ALANIS – February 26, 2025**

41)     On February 25, 2025, the CI reached out to SILVA-ALVAREZ on his Telegram account, account name "Chuky", asking if he still had the gold button for sale. Previously, on February 23, 2025, a gold button was posted for sale in the telegram page TheMenu (pictured

19

below left). SILVA-ALVAREZ told the CI that button was still available. They agreed on a price of $400 and to meet the following day (pictured below right).

 

42)    On February 26, 2025, at approximately 1212 hours, the CI E/S was activated at a pre-designated location and moments later the CI arrived at the deal location of 1802 S 44th ST Milwaukee, WI 53214. The CI was under constant surveillance by ATF and WPD while at the pre-designated location and the deal location from the time the E/S was activated through the completion of the deal and debrief of the CI.

43)    WPD set up surveillance at approximately 1100 hours at SILVA-ALVEREZ residence, 4331 S 76th ST Milwaukee WI 53220. WPD observed a black Nissan Altima with WI plate AVH1119 pull into the driveway of SILVA-ALVAREZ residence at approximately 1110 hours, SILVA-ALVAREZ get into the vehicle (pictured below) and depart a few minutes later. This Altima is the same Altima that ALANIS drove to the prior two deals.

20

 

44)     At approximately 1300 hours surveillance observed the Altima with WI plate AVH1119 pull into the driveway of 4331 S 76th and depart approximately a minute later from that address. At approximately 1332 hours SILVA-ALVAREZ departed 4331 S 76th St in a black Ford Explorer WI license plate AYZ4967 (pictured below left). This plate comes back to a Hector Silva with a DOB of 3/11/1976. Surveillance maintained constant surveillance of the Ford Explorer. At approximately 1340 hours the Explorer pulled into the alleyway of 2128 S 59th St West Allis, WI 53219. Then 3 Hispanic males in their 20s approached the driver side of the Explorer and a few minutes later the Explorer departed the alleyway. From there the Explorer drove to 4242 W Willow Way, Milwaukee, WI 53221, arriving at approximately 1356 hours (pictured below right) and departed 4242 W Willow Way at approximately 1359 hours. From there the Explorer arrived at the Arby's at 1661 Miller Park Way, West Milwaukee, WI 53214 at approximately 1407 hours. This Arby's is only one block away from the deal location and at approximately 1410 hours the Explorer arrived at the deal location.

21

 

45)    At approximately 1410 hours, WPD observed the Explorer pull up next to the CI's vehicle (pictured below left). At approximately 1410 hours the CI exited their vehicle and got into the back passenger seat of the Explorer. The Explorer pulled away from the deal location and parked on 44th not far from the deal location. Shortly after the Explorer circled the block and returned deal location. The CI left the Explorer and got back into their vehicle at approximately 1412 hours and the deal was completed. The Explorer and CI were under constant surveillance during the deal. The firearm purchased was a GLOCK GMBH; Model: 19X; Caliber: 9; Type: PISTOL; S/N: CDUT644 and was purchased for $1,200 (pictured below middle). The MCD purchased was a gold Glock switch and was purchased for $400 (pictured below right). The total cost was $1,600.

  

46)    During the day of the deal the CI stated they reached out to SILVA-ALVAREZ on his Chuky Telegram account asking if SILVA-ALVAREZ had any Glocks or other firearms for sale. SILVA-ALVAREZ replied that he has a 19x mos. Through training and experience I know

22

that 19x mos is referring to a type of Glock pistol. SILVA-ALVAREZ also provided the CI a phone number of 262-277-6427 and told the CI to reach on that phone number because the one they are communicating on is about to die. SILVA-ALVAREZ told the CI that the 19x would be $1,200 (all pictured below left). SILVA-ALVAREZ and the CI agreed on the total price of $1,600 and the CI provided SILVA-ALVAREZ with the address of the deal location. SILVA-ALVAREZ later on that day reached back out to the CI provided the phone number of 414-870-3317 and to have the CI call SILVA-ALVAREZ. This is pictured below in the middle and the picture shows that the CI placed an outgoing call to the Chuky Telegram account. On this call you can hear SILVA-ALVAREZ ask the CI if the CI wants SILVA-ALVAREZ to put the MCD on or have the CI do it themselves. They also discuss where they want to meet to do the deal. When selecting the phone number of 414-870-3317 that SILVA-ALVAREZ sent the CI, it shows that the profile associated with the number is SILVA-ALVAREZ's Chuky profile (pictured below right). I know from training and experience that Telegram requires you to have a phone number to make an account and if you do not manually change your settings to hide your phone number that is tied to your account, then the phone number and account will show that they are connected. The Chuky Telegram profile and the communications the CI had on this account with SILVA-ALVAREZ are all tied to the phone number of 414-870-3317.

23

  

47) The CI switched to the other phone number (262-277-6427) SILVA-ALVAREZ had provided and reached out via the x6427 number in Telegram. That number is linked to the Telegram account of Dra Ko. SILVA-ALVAREZ told the CI that his phone died, and he will be leaving the gym soon. About 40 minutes later, at approximately 1249 hours, SILVA-ALVAREZ told the CI that he is leaving the gym now and asked for an address. The CI provided the address of the deal location (all pictured below left). When selecting the phone number of 262-277-6427 number that SILVA-ALVAREZ sent the CI it shows that the profile associated with the x6427 number is SILVA-ALVAREZ's Dra Ko profile (pictured below right). The Dra Ko Telegram profile and the communications the CI had with SILVA-ALVAREZ on this account are all tied to the phone number of 262-277-6427.

24

 

48)    During the deal the CI stated that a newer black SUV pulled up to their vehicle and that they tried getting into the front passenger seat of the vehicle but that there was a person sitting there so they got into the back passenger seat. The CI stated that the driver was the person that they know as "Chuky". The CI stated SILVA-ALVAREZ was wearing a black shirt and had no mask on while the passenger was wearing a black hooding and mask. The CI stated the passenger was short like ALANIS but could not tell for certain if the passenger was ALANIS. The CI stated that the passenger did not say anything while the CI was in the Explorer.

49)    The CI stated that SILVA-ALVAREZ described the features of the firearm he was selling, told the CI where to put the MOS sight and asked if the CI knew how to put on the MCD. I know from training and experience that MOS stands for Modular Optic Systems and that it is a type of sights for firearms. SILVA-ALVAREZ also asked if the CI was going to sell the firearm, and the CI told said they are selling the firearm. SILVA-ALVAREZ also told the CI that the firearm is clean but the person they got it from said it was stolen. I know from training and experience that clean is reference that the firearm has not been used in a shooting.

50)    Review of audio confirms SILVA-ALVAREZ describes the features of the firearm he was selling, where to put the MOS sight, and asking the CI if they knew how to put on the MCD. It also confirms SILVA-ALVAREZ asked the CI if they were going to sell the firearm.

25

SILVA-ALVAREZ stated the firearm was clean and that the guy SILVA-ALVAREZ got the firearm from said he got it from the store and reported it stolen. A law enforcement database check of the firearm shows that the firearm is not currently reported stolen. SILVA-ALVAREZ also told the CI that the firearm was also only shot in the range and tells the CI again that it is not dirty. SILVA-ALVAREZ also tells the CI to be smooth with the firearm. From training and experience I understand this to mean that SILVA-ALVAREZ is telling the CI to be careful not to get caught with the firearm. Video shows the CI getting out of their car and into the back passenger seat of a black SUV and approximately 2 minutes later the CI getting out of the black SUV and back into their vehicle. The firearm purchased can also be seen on camera once the CI gets back into their vehicle. Due to the angle of the camera, it was unable to capture either the driver or the front passenger.

51)     On February 21, 2025, the Honorable Judge Nancy Joseph signed a ping warrant for Irving ALANIS's phone number of 385-466-7398 (Target Cellular Device). During the day of the deal the location data was being monitored. The pings shows that ALANIS's phone was pinging in the area of SILVA-ALVAREZ address at 1123 hours, which is not long after the Altima pulled in the driveway of SILVA-ALVAREZ's residence. The next ping of ALANIS's phone was pinging in the area of 27th and College in Greenfield from 1138 hours to 1253 hours. In this area is a gym and SILVA-ALVAREZ told the CI at 1249 hours that he was leaving the gym now. The pings show ALANIS's phone moved on a path that is consistent with driving from the gym to his residence. It should be noted that Google maps has the driving time between ALANIS's address of 4242 W Willow Way and SILVA-ALVAREZ's address of 4331 S 76th ST at 7 minutes. For ALANIS to drive from the gym to SILVA-ALVAREZ residence and then to his residence the ping data would only show one ping between ALANIS's residence and SILVA-

26

ALVAREZ's residence based on the total drive time and frequency of the pings. It would be consistent with the pings that on the drive home from the gym ALANIS stopped at SILVA-ALVAREZ's residence and then his residence while not pinging around SILVA-ALVAREZ residence. Later at 1353 hours ALANIS was pinging in the area of is residence and the next ping at 1408 hours shows him in the area of deal location (pictured below left). It is highly probable ALANIS was the passenger in the car with SILVA-ALVAREZ because: the Altima showing up to SILVA-ALVAREZ residence prior to pinging around the gym and SILVA-ALVAREZ telling the CI he was at the gym, the CI's description of the passenger's clothing (consistent with what ALANIS wore in the last 2 deals), the CI stating the passenger is similar in height as ALANIS, SILVA-ALVAREZ showing up to ALANIS's residence prior to the deal, the fact that SILVA-ALVAREZ and ALANIS run the telegram page TheMenu together and finally the firearm purchase was pictured on TheMenu with what is believed to be the same firearm that the CI purchased on the second buy (pictured below right).




**Second CI Buy from Alexander SILVA-ALVAREZ/ Fourth Buy from Irving ALANIS –**

**March 26, 2025**

52)     On March 18, 2025, SILVA-ALVAREZ sent a message to the CI, through telegram that he had an "invisible switch" and a "regular button." Through training and experience I know that an "invisible switch" refers to a MCD that is attached to a Glock pistol in a way where it is flush to the back slide of the pistol. A "regular button" refers to a MCD that protrudes out of the back of the slide with a button to push that allows the firearm to operate both as a semi-automatic and a full auto. An invisible switch makes the firearm only operable as a full auto. On March 19, 2025, SILVA-ALVAREZ messaged the CI that for one of the MCDs it would be $300 but $250 each if the CI were to purchase both. The CI asked if he had any firearms to go with the MCDs and on March 20, 2025, SILVA-ALVAREZ messaged the CI know that he would try to get some (all pictured below).



53)    Later, on March 20, 2025, SILVA-ALVAREZ messaged the CI that he could not find any firearms but was willing to let go of his 17C. Through training and experience I know that 17C is referring to a Glock 17C. On March 21, 2025, the CI let SILVA-ALVAREZ know that they would buy the 17C with an MCD. SILVA-ALVAREZ asked if the CI wanted one firearm with a MCD or two and that for the 17C with a MCD it would be $1,500 (pictured below).



54)    On March 22, 2025, the CI again informs SILVA-ALVAREZ that they will purchase the 17C and asked how much for a second firearm. SILVA-ALVAREZ messaged the CI that he has a 22C and on March 23, 2025, the CI asks how much. Through training and experience I know that a 22C is referring to a Glock 22C. On March 24, 2025, SILVA-ALVAREZ messaged the CI it will cost the same price already given of $1,500 and asks the CI when they can meet. The CI let SILVA-ALVAREZ know they could meet on Wednesday, March 26 (all pictured below).

29



55)     On March 25, 2025, SILVA-ALVAREZ messaged the CI that the 22C, that he

offered to CI, is already sold but that he still has the 17C with an MCD. SILVA-ALVAREZ also

let the CI know that he can look for another firearm to go with the other MCD. They also agree

with meeting on March 26, 2025 (pictured below left). SILVA-ALVAREZ again asks the CI if

they are good to meet up because his guy is leaving tonight, and SILVA-ALVAREZ can have his

guy drop it off so he can have it for tomorrow. This message is understood as SILVA-ALVAREZ

is getting either the firearm or the MCD from another individual. Through training and experience

I know that individuals who deal illegally in firearms and MCDs will sometimes get either the

firearms or MCDs from other individuals prior to selling those items. Later that night SILVA-

ALVAREZ lets the CI know that he has a 23 and asks if he can sell that to the CI instead of the

17C because he wants to keep the 17C (pictured below right). Through training and experience I

know that a 23 in this context is referring to a Glock 23.

30




56)     On March 26, 2025, the morning of the deal the CI asked if SILVA-ALVAREZ was willing to sell both firearms previously mentioned above, from communications on March 25, 2025. SILVA-ALVAREZ messaged the CI that for the 17C with a button it would be $1,600 and the 23 with a button it would $1,500. SILVA-ALVAREZ told the CI if they grab both it would cost $3,000. SILVA-ALVAREZ also asked the CI when they would be meeting up and provided the CI with a meet location of 3800 W Burham St, Milwaukee, WI, 53215 (all pictured below).



57)     On March 26, 2025, on the day of the deal, the CI's E/S was activated at the pre-designated location and at approximately 1024 hours the CI departed the pre-designated location en route to the agreed upon deal location of 3800 W Burnham St, Milwaukee, WI 53215. CI arrived in the area of the deal location at approximately 1030 hours. During this drive the CI was under constant surveillance by ATF and WPD. While at the deal location ATF, WPD, and MPD maintained surveillance of the CI during the deal.

58)     On March 21, 2025, the Honorable Judge Duffin signed off on a location data warrant for Alexander SILVA-ALVAREZ's phone number of 414-870-3317. During the day of the deal the location data was being monitored. At approximately 1033 hours surveillance units observe SILVA-ALVAREZ leaving his residence of 4331 S 76th St. Milwaukee, WI and get into a Ford Explorer with WI license plate of AYZ4967 (pictured below).  This is the same vehicle that SILVA-ALVAREZ has been observed on multiple occasions including past controlled purchases. GPS ping locations on SILVA-ALVAREZ's phone (414-870-3317), showed SILVA-ALVAREZ in the area of his residence for multiple hours prior to him being observed leaving the residence. Surveillance on the residence also showed that the Explorer was parked for multiple hours in the same spot prior to SILVA-ALVAREZ getting into the vehicle.

32



2025/03/26
10:33:45

59)    ATF and MPD followed SILVA-ALVAREZ in his Explorer to a Walgreen parking lot at 6030 W. Oklahoma Ave. Milwaukee WI. at approximately 1041 hours. During the time that SILVA-ALVAREZ was parked at Walgreens, a GPS location ping showed that at 1043 hours the cell phone with number 414-870-3317 moved with him to the location of the Walgreens.  Below is a photo of the location pings showing SILVA-ALVAREZ's movements to and from the controlled purchase.  The red arrow points to SILVA-ALVAREZ's location in the area of the Walgreens at 1043 hours.



60)    At approximately 1044 hours, MPD observed a white Honda Accord bearing WI license plate of ANT4936 pull up next to SILVA-ALVAREZ. Law enforcement data base check

33

shows license plate ANT4936 is registered to Beatriz Cuna-Ruiz (DOB:11/07/1987) and Santiago

Omar CUNA (06/12/2004) at an address of 6154 W Kinnickinnic River Pkwy Milwaukee WI.

SILVA-ALVAREZ is then observed getting out of his Explorer and walking to the driver window

of the Accord.  SILVA-ALVAREZ is observed conducting a hand-to-hand deal with the male

driver of the Accord.  The driver appears to have tight braided black/ dark brown hair and looks to

be in his late teens to early 20's. This interaction was recorded on video and below are

photographs of SILVA-ALVAREZ conducting the hand-to-hand with the driver. Moments after

conducting the hand-to-hand transaction, SILVA-ALVAREZ get back into his Explorer.  SILVA-

ALVAREZ and the Accord leave the area in separate directions.






34

61)     At approximately 1050 hours, surveillance units followed SILVA-ALVAREZ to the area of 36th St. and W Grant St. where SILVA-ALVAREZ parked his vehicle facing west bound on Grant St. This location is only a few blocks from the deal location that SILVA-ALVAREZ provided the CI. At approximately 1051 hours, surveillance observed Irving ALANIS leave his residence at 4242 Willow Way, Milwaukee WI and get into a black Nissan Altima bearing WI license plate AVH1119 (pictured below). ALANIS has been observed in this vehicle multiple times before by law enforcement including previous controlled purchases of firearms.



62)     At approximately 1056 hours, ALANIS is observed arriving in the area of W Grant St. and 36th St. and parking behind SILVA-ALVAREZ. At approximately 1058 hours, SILVA-ALVAREZ is observed leaving his Explorer carrying a pistol with an extended magazine hidden in his pocket and walking to ALANIS' vehicle. Once SILVA-ALVAREZ gets to ALANIS' vehicle, he hands the pistol over to ALANIS.  SILVA-ALVAREZ is then observed handing a second smaller object over to ALANIS from a pocket on his right side (the pistol was on his left). ALANIS' arrival in the area and the interaction between him and SILVA-ALVAREZ were video recorded by MPD. Below are photos taken from the recording of SILVA-ALVAREZ and

35

ALANIS interactions. The red arrow in the first photo points to the Explorer which is obstructed by an unrelated GMC SUV. The red arrow in the second photo points to the extended magazine of the firearm SILVA-ALVAREZ handed off to ALANIS.







63)     At approximately 1100 hours, SILVA-ALVAREZ drives from 36th St. and W Grant St. to the CI's location at 37th St. and W Burnam St. SILVA-ALVAREZ is observed pulling up next to the CI's vehicle and after a short time SILVA-ALVAREZ is observed driving

36

south bound on 37ᵗʰ St. with the CI following him in the CI's vehicle. During this time, other surveillance units kept eyes on ALANIS who did not move from his location (pictured below).



64) At approximately 1103 hours, SILVA-ALVAREZ and the CI drive back to ALANIS' location and both park their vehicles along the side of the road. SILVA-ALVAREZ is then observed going over to ALANIS' vehicle and being handed something through the window. He then goes back to his Explorer and gets into the driver seat. The CI then gets out of his vehicle and gets into the front passenger seat of the Explorer. At approximately 1104 hours, the CI is observed leaving the Explorer and getting back into the CI's vehicle. The CI, SILVA-ALVAREZ, and ALANIS all leave the area at approximately the same time.

65) During the time of the deal the GPS ping location for SILVA-ALVAREZ's phone and ALANIS' phone (385-466-7398, Target Cellular Device) were being monitored and it showed that both phones were in the same location during the duration of the controlled purchase (pictured below).

37



66) MPD, WPD and ATF units follow both ALANIS and SILVA-ALVAREZ back to their residences. ALANIS arrives at 4242 Willow Way at approximately 1110 hours. ALANIS stays in his vehicle till approximately 1121 hours when he exits the Altima and goes into the residence of 4242 Willow Way Milwaukee, WI (pictured below left). At approximately 1120 hours, SILVA-ALVAREZ is observed arriving at his residence of 4331 S 76th St Milwaukee, WI, and going inside his residence (pictured below right).





67) During the deal the CI messaged SILVA-ALVAREZ that they arrived at the area SILVA-ALVAREZ provided, and SILVA-ALVAREZ told the CI that he was on his way and then that he was 10-12 minutes out. The CI provided their exact address and SILVA-ALVAREZ told the CI that he was pulling up (pictured below).

38



68)     The CI stated that while they were waiting for SILVA-ALVAREZ to arrive at the agreed upon location, a black Ford Explore pulled up to next their vehicle. The CI stated that SILVA-ALVAREZ was inside of the Ford Explorer and told the CI to follow him. The CI followed him to and explained that SILVA-ALVAREZ pulled up to where ALANIS's vehicle, a black Nissan Altima, was parked. The CI stated that they could not see who was in the Altima but explained that they know it was ALANIS's vehicle based on previous interactions with ALANIS and that Altima. The CI stated they observed SILVA-ALVAREZ go up to Altima and the individual in the driver seat of the Altima handed SILVA-ALVAREZ a firearm with an extend magazine. The CI explained this is the same firearm that they purchased with the extended magazine. The CI described the driver of Altima to be in black hoodie.

69)     The CI explained that after SILVA-ALVAREZ interacted with the Altima the CI stated that SILVA-ALVAREZ waved for the CI to enter SILVA-ALVAREZ's vehicle. The CI explained that SILVA-ALVAREZ gave him the two firearms that were purchased, and SILVA-ALVAREZ told the CI that he did not want to give up the 17C, referring to the firearm he got from the Altima, because it is rare. The CI also explained the 17C was SILVA-ALVAREZ's personal firearm.

39

70)     The CI was shown the below photo of SILVA-ALVAREZ which was taken not long after the deal when SILVA-ALVAREZ got back to his residence of 4331 S 76th St, Milwaukee, WI. The CI confirmed that this was the individual who sold them two firearms affixed with MCDs.



71)     Review of audio and video recording shows a black Explorer pulls up next to the CI's vehicle and an individual tells the CI to follow him down the block. The CI can be heard giving out the license plate of AYZ4967 of the vehicle they are following. This is the same plate AYZ4967 for the Ford Explore that surveillance observed the day of the deal and that SILVA-ALVAREZ drove to a previous controlled buy where he sold the CI a firearm and MCD. Once parked, the video shows the CI getting out of their vehicle and getting into a black Ford Explore with that same license plate (pictured below).



72)     Once the CI is in the Explorer the video shows SILVA-ALVAREZ sitting in the driver's seat of the Explorer. As he is handing the firearms to the CI, SILVA-ALVAREZ says, "I just had…had my cousin put these motherfuckers on that shit. Thats them right there." Based on training and experience it is understood that "motherfuckers" is referring to the MCD and "shit" is referring to the firearm. Based off of this statement, surveillance, prior to the deal, observing SILVA-ALVAREZ conduct a hand-to-hand deal of a small item, surveillance later observing SILVA-ALVAREZ hand the firearm with the extended magazine and a separate smaller item to ALANIS who is sitting in the Altima, the CI stating in the debrief that they observed the individual in the Altima hand the firearm with the extended magazine to SILVA-ALVAREZ and the CI previously stated that they believe SILVA-ALVAREZ and ALANIS are cousins, it is believed that ALANIS installed the MCD on the firearm SILVA-ALVAREZ handed him. It is also believed that the smaller item SILVA-ALVAREZ handed to ALANIS was the MCD to be installed.  Pictured below left is SILVA-ALVAREZ in the driver seat of the Explorer and pictured below right is SILVA-ALVAREZ handing a firearm to the CI.

 

73)     SILVA-ALVAREZ can also be heard telling the CI that one of the firearms has a skull on the invisible button. He goes on to state "That C bro that motherfucker rare bro. I didn't even wanna get rid of it." SILVA-ALVAREZ also tells the CI that his guy got a 22C but that he wanted more money for it. Based off of training and experience a 22C is referring to a Glock 22C. Also, during the video, the CI can be seen handing the money to SILVA-ALVAREZ. A black Nissan Altima with a plate of AVH1119 parked in front of SILVA-ALVAREZ's Explorer is also captured on video while the CI is in the Explorer (pictured below). This is the same vehicle that both surveillance and the CI observed SILVA-ALVAREZ interacting with.



74)     The firearms purchased are a GLOCK INC.; Model: 17C; Caliber: 9; Type: PISTOL; S/N: AHPL948 with a MCD for $1,500 and a GLOCK GMBH; Model: 23; Caliber: 40; Type: PISTOL; S/N: BXAK479 with a MCD for $1,500(pictured below). The total cost was $3,000.

42



**Third CI Buy from Alexander SILVA-ALVAREZ April 10, 2025**

75)      On April 1, 2025, ALANIS messaged, via the target cellular device, the CI saying he had a Glock 23 with a button for $1,350 and sent a photo of the Glock 23 (pictured below left). ALANIS also posted for sale on Telegram a photo of an AR pistol and a black and tan handgun (pictured below middle). On April 2, 2025, The CI asked ALANIS how much for the AR pistol. ALANIS, via the target cellular device, told the CI it is $1,500 and that it is binary (pictured below right). Based off of training and experience I know that binary refers to a modification that is done to the firing systems of the firearm that allows the firearm to expel one round when the trigger is pulled and an additional round when the trigger is released.

  

43

76)     On April 7, 2025, the CI observed on Telegram SILVA-ALVAREZ post three firearms and reached out to SILVA-ALVAREZ asking how much for all three of the firearms. SILVA-ALVAREZ tells the CI that the price is firm but two of the firearms are binary. On April 8, 2025, the CI let SILVA-ALVAREZ know they would buy all 3 firearms. SILVA-ALVAREZ explained that one of the three firearms is pending sale to another individual because that individual is willing to buy it for $1,750. The CI tells SILVA-ALVAREZ they will swing through on Thursday to buy the firearms. Later that day SILVA-ALVAREZ told the CI the other individual fell through, and that SILVA-ALVAREZ would be selling the CI all three firearms. SILVA-ALVAREZ also tells the CI that he is on his way to his storage unit to pick up the firearms (pictured below left). SILVA-ALVAREZ sends the CI a photo of two of the firearms he is selling to the CI (pictured below right). The CI asks SILVA-ALVAREZ if he has any firearm boxes for the firearms being purchased and SILVA-ALVAREZ lets the CI know that he does for the Glock, and he would have to check his brother's house for the FN. Also pictured below right.




77)     On April 9, 2025, SILVA-ALVAREZ lets the CI know that he has a box for all of the firearms and that he did have the gun box for the FN. He also lets the CI know that he will ask his cousin if he has the bag for the AR pistol. Based off of SILVA-ALARVEZ and ALANIS being cousins, ALANIS posting on Aril 1, 2025 a photo in Telegram of an AR pistol and FN pistol, these two firearms looking the same when comparing ALANIS photo and SILVA-ALARVEZ photo, and ALANIS and SILVA-ALVAREZ working together in the past to sell firearms and MCDs it is believed that the AR pistol and the FN pistol are the same firearms and ALANIS and SILVA-ALVAREZ are working together in the sale of these firearms.

78)     On April 10, 2025, at approximately 1120 hours the CI E/S was activated and at approximately 1124 hours the CI departed the pre-designated location en route to the deal location of 1900 S 37th ST Milwaukee, WI 53214. At approximately 1128 hours the CI arrived at the deal location. During this drive the CI was under constant surveillance by ATF and WPD. While at the deal location ATF, and WPD maintained surveillance of the CI during the deal.

79)     While the CI was en route to the deal location SILVA-ALVAREZ sent the CI a photo of a FN pistol in a gun box, a Glock gun box, a Glock pistol and an AR pistol all in a cardboard box (pictured below). The CI let SILVA-ALVAREZ know their location, which is where the deal occurred and the same spot the CI met SILVA-ALVAREZ on the previous deal. SILVA-ALVAREZ told the CI he arrived at the deal location.



80)     At approximately 1139 hours surveillance units observed SILVA-ALVAREZ leave his residence with a brown cardboard box and go to a black Ford Explorer AYZ4967 (pictured below). This is the same Explorer SILVA-ALVAREZ has used in past deals. At approximately 1142 hours SILVA-ALVAREZ departed in the Explorer and headed to the deal location. At approximately 1153 hours SILVA-ALVAREZ arrived at the target location. He was under constant surveillance during his drive and made no stops in between his residence and the target location.



46

81)     At approximately 1155 hours the deal concluded, and SILVA-ALVAREZ departed the area. Both the CI and SILVA-ALVAREZ were under constant surveillance during the deal. After the deal concluded and SILVA-ALVAREZ departed the area it was learned that SILVA-ALVAREZ sold the CI items not agreed upon instead of three firearms they previously agreed upon. The items purchased are a Glock gun box for a G23 S/N BSYL256, a Ruger gun box for a Ruger 57 S/N 641-83358, 3 water bottles, a blue blanket, softball size rock, a $CO_2$ powered BB Gun and a cardboard box (pictured below). These items were purchased for $4,800.



82)     After the deal concluded the CI was debriefed by ATF and WPD. ATF searched the CI's phone to include phone calls, text messages and the Telegram app and found no indication in anyway the CI was aware of the deception by SILVA-ALVAREZ in the sale of false goods. When going back into Telegram SILVA-ALVAREZ blocked the CI from the main account he communicated with the CI (account name Chuky) and SILVA-ALVAREZ's channel (channel name TheMenu) he is advertising the firearms and MCDs. SILVA-ALVAREZ did not block the CI from his other Telegram account Dra Ko and the CI was able to send SILVA-

47

ALVAREZ a message. SILVA-ALVAREZ then blocked the CI from that account (pictured below).



83)     During the debrief of the CI the CI explained that the black Ford Explorer pulled up to their vehicle and this was the same Explorer SILVA-ALVAREZ used in the previous two deals. The CI also explained that it was SILVA-ALVAREZ who they met and is the same person from the past two deals. The CI stated they talked about sunglasses and the CI asked SILVA-ALVAREZ if he had any switches. SILVA-ALVAREZ told the CI he would have to ask his cousin because the CI bought all the switches SILVA-ALVAREZ had.

84)     The CI also explained that SILVA-ALVAREZ was armed with a Glock handgun with an extend magazine and what they believed was a holosun sight. The CI explained that this firearm was wedged in between the driver seat and center console. Through training and experience I know that individuals illegally dealing in firearms also will carry a firearm for their protection and that the location described by the CI is a common spot for these individuals to have their firearms.

48

85)     The CI explained that they paid SILVA-ALVAREZ and then grabbed the cardboard box from the trunk of SILVA-ALVAREZ vehicle. The CI went back to their vehicle and SILVA-ALVAREZ left. The CI checked the box and found inside two empty gun boxes, a bb gun, some water bottles, a rock and a blanket.

86)     Review of audio confirms that the CI and SILVA-ALVAREZ talked about if SILVA-ALVAREZ had any more switches and SILVA-ALVAREZ explaining he would have to ask his cousin because SILVA-ALVAREZ sold all of his. SILVA-ALVAREZ also goes on to say that the switches his cousin has are gold and he is not sure if his cousin would want to sell those. Review of the video shows the black Explorer and the license plate of AYZ4967 (pictured below) which is the same vehicle SILVA-ALVAREZ has used in pervious deals.



87)     The video also confirms it is SILVA-ALVAREZ that the CI is interacting with and shows SILVA-ALVAREZ handling the money the CI gave him. When SILVA-ALVAREZ is handling the money, you can see his hand tattoo (pictured below left). When going on the Facebook profile for SILVA-ALVAREZ he posted on April 7, 2025, a photo of himself where you can see his hand tattoo (below right). When comparing the two photos you can see that they are the same tattoo.

49




SILVA-ALVAREZ hand tattoo from deal    SILVA-ALVAREZ hand tattoo from Facebook

### Identification of SILVA-ALVAREZ's New Phone Number

88)    On April 18, 2025, the Honorable Judge William Duffin of the Eastern District of Wisconsin granted an extension to the location data warrant for SILVA-ALVAREZ's phone number of 414-870-3317. On April 21, 2025, ATF was monitoring the pings and saw that the ping was returning with "no location returned for target". The last location provided was from April 18, 2025. ATF contacted Verizon Wireless regarding the lack of location returns. Due to the language in the warrant Verizon Wireless was able to provide ATF with information that SILVA-ALVAREZ switch his phone number from 414-870-3317 to a new phone number of 262-666-2846. Based off my training and experience I know that individuals who illegally deal firearms, machineguns and MCDs, will commonly switch their phones to help avoid detection and monitoring by law enforcement.

### Review of Irving ALANIS's iCloud

89)    On March 21, 2025, the Honorable William Duffin granted a search warrant for Irving ALANIS's iCloud accounts of alanisirving2003@icloud.com and rexman001@icloud.com. As part of the return Apple provided account information for the iCloud accounts that the warrant was served on. The account information showed that these accounts have an address of 4242 W Willow Way, Milwaukee WI and a phone number of 414-731-4340. This address and phone number have been previously established as the address and phone number for ALANIS. The

50

information also showed a phone number of 224-474-7345 belonging to Irving ALANIS. In addition to the two iCloud accounts the warrant was served on Apple provided 5 additional iCloud accounts, which are as follows: shabby.god@icloud.com, balmainparis10@icloud.com, irvingalanis003@icloud.com, irvingalanis123@icloud.com, and irvingalanis03@icloud.com. The shabby.god@icloud.com and balmainparis10@icloud.com accounts have the same address and phone number as ALANIS. The other 3 accounts below have not only the same address and phone number but also list Irving ALANIS as the name on the account.

90) Included in the information provided by Apple are notes. Included in these notes is a note of a list of items. With this list it has the price paid for, the price sold for and the profit for each item (pictured below left). The list includes words like "cookies" and "carts" and based off my training and experience I know these are slang for controlled substances. I also know based off my training and experience that individuals who illegally deal in firearms and controlled substances will keep a ledger of money spent and money made off the firearms and controlled substances they have bought and sold. There is also a second note of a list of items similar to the first note (pictured below right).Based off my training and experience I know that illegal firearms dealing is often done through cellphones and cellphones can further the illegal activity of a person. I also know through training and experience I know that individuals that deal in illegal firearms dealing also use multiple different phones. Through my training and experience I know that individuals who deal in illegal firearms travel to different locations to meet with the individual they are selling to because of this the Ping and cell data can help establish frequency of deals, who ALANIS is dealing with and patter of life.

51



91) A third note found on the iCloud is a list of people who owe debt and the amount they owe (pictured below). Based off my training and experience I know that individuals who illegally deal in firearms and controlled substances will keep a record documenting who owes them money and how much they owe.



92)     Also included in the information provided by Apple was photos and contact information for different individuals. Some of the photos found on the iCloud include multiple different firearms. The below left photo is multiple firearms on a bed. The metadata of this photo shows that the provider date is 4/3/23 and the location is 4242 W Willow Way Milwaukee, WI. The below middle photo is of multiple firearms and firearm cases in the trunk of a vehicle. One of the pistols in the photo appears to have an MCD attached to it. The metadata of this photo has a provider date of 4/18/23. The below right photo is of a wide variety of firearms displayed on a wall. The metadata of this photo has a provider date of 6/6/24. Based off my training and experience these photos with the volume and types of firearms are consistent with firearms that are trafficked both in United States and Mexico.

  

93)     The below left photo shows a pistol with an MCD attached in the cup holder in the center console of a vehicle. Also in the photo is a large plastic bag of marijuana. The metadata of this photo has a provider date of 6/12/24. The below middle photo shows a pistol wedged between the driver seat and center console of a vehicle with marijuana packaged in a plastic bag on the center console and US currency located in the center console cup holder. The metadata of this photo has a provider date of 9/9/24. The below right photo is of multipole vacuum sealed bags of

53

marijuana with three pistols on top of the marijuana. The metadata of this photo has a provider date of 9/14/24. Based off my training and experience these photos display actions that are consistent with an individual who sells controlled substances and uses firearms for their protection while selling the controlled substances.

  

94) The below left photo is of white pills with the caption "Hit me while they here". The metadata of this photo has a subscriber date of 9/9/23. Based off my training and experience "Hit me while they here" in the photo is an advertisement of the controlled substances for sale and is telling the buyers to reach out to buy them before they are gone. The below middle photo and below right photo are photos of white pills packaged in a plastic baggie. The metadata for the below middle photo has a provider date of 11/10/23 and the below right has a provider date of 11/14/23. Based off my training and experience these photos display actions that are consistent with an individual who sells controlled substances.

54

  

95)     Also on the iCloud are photos of screenshots of different text messages. The below left photo is a screenshot of text message with "Jefe". Jefe sent a message of "mira lo que tienen de evidencia" which translated through google translate comes to "look at what evidence they have". Following that message Jefe sent a picture with firearm casings in a zip lock bag. The metadata of this photo has a provider date of 11/13/23. The below right photo is a screenshot of text messages with "Pops". The contact number for Pops provided in the Apple return has a phone number of 414-687-4483. A law enforcement database check shows that this number belongs to Armando Alanis SR who is Irving ALANIS father. Irving ALANIS sent "Deje 2K abajo de la caja de dish en tu cuarto ya cuando acade con estos movimientos te doy mas" which translated through google translate comes to "I left 2K under the dish box in your room, and when I finish these moves I'll give you more".  The metadata of this photo has a provider date of 9/19/24. Based off training and experience "moves" is frequently used as slang for selling illegal substances.

55




96) The below left photo is of a screenshot of a group message with 6 people. "Peter Pan" sent messages of "The spot hot Unc said" "And they asking bout Irv" "Feds". The metadata has a provider date of 7/1/24. Based off of my training and experience the term "spot hot" typically means that there is a law enforcement presence in an area, or the area is being looked into by law enforcement. It is understood that "Irv" is referring to Irving ALANIS, "Feds" is referring to federal law enforcement and that "they" is federal law enforcement asking about ALANIS. The below right photo is a screenshot of text massages involving a "Dell2.0" and a "Peter Pan". Dell2.0 sends a message of "I think I just lost a load" and ALANIS replying with "From the mail?". Dell2.0 has a contact number of 559-892-9719 saved in the iCloud. A law enforcement database check shows that this number belongs to a Dellan M Sikhathakhosa with a DOB of 7/1/2001 and an address of 6671 N Delbert Ave Fresno CA 93722. The metadata for this photo has a provider date of 9/19/24. Based off my training and experience "load" is referencing a

package of illegal substances. It is also common for illegal substances to be shipped through the mail and for these packages to get lost, stolen or interdicted.

 

97)     Also in the iCloud photos are two screenshots of two different Telegram pages. The below left photo is the Telegram page titled "WE UP LA PRIVATE MENU". Visible in the photo is marijuana in the context of buying it in bulk. The photo also shows this page is the "Back Up Page" and "DM @WeUpLA To Order". Based off my training and experience "DM @WeUpLA To Order" is referring to sending a direct message to another account (@WeUpLA) to order the marijuana. The metadata for this photo has a provider date of 6/13/24. The below middle photo is the Telegram page titled "TopDollarInc". Visible in the photo is the

57

advertisement of marijuana products. The metadata for this photo has a provider date of 6/13/24. The below right photo is of SILVA-ALVAREZ and ALANIS posing with firearms in front of vehicles. The metadata for this photo has a provider date of 11/12/23 and has a location 4331 S 76th St Greenfield, WI. This address has been previously established as SILVA-ALVAREZ current residence.

  

98) All of the above-mentioned photos found on ALANIS's iCloud have a date range based off the metadata from April of 2023 to September of 2024. Based off what is in the photos and my training and experience these photos display actions and communications that are consistent with individuals who are engaged in illegal activities to include the selling of controlled substances and the illegal selling and trafficking of firearms.

**Debrief of CI May 13, 2025**

99) On May 13, 2025, ATF and WPD debriefed the CI. The CI explained that ALANIS is still actively selling marijuana on his Telegram page "MilhouseMenu". The CI

58

explained that on April 18, 2025, ALANIS posted on his telegram page, "…I can't do my prices on QPs that I posted that's my peoples products,". Based on training and experience I know that "QPs" is short for quarter pound and QP is commonly used when discussing drug weights. I also know that "Product" is slang for controlled substances. This sentence ALANIS posted is understood that he cannot sell the QPs at the price he normally offers because he is selling his associates' ("peoples") controlled substances. Then on April 21, 2025, ALANIS posted on his Telegram page prices for different amounts of marijuana. Both of these posts are pictured below.



100)    The CI further stated that on April 30, 2025, ALANIS was posting pictures of marijuana on his Telegram page (pictured below left) and posting, on the same day, on his Instagram account (milhouse448) an advertisement of marijuana prices (pictured below right). This photo shows words like "QP" "HP" followed by numbers and words like "cookies". Based

59

off of my training and experience in know that "QP" and "HP" are weights of controlled substances and when followed by a number that number is representing the price that weight is being sold for. I also know that words like "cookies" are used as slang for controlled substances. I also know that individuals who advertise the sale of controlled substances on apps like Instagram will use slang and abbreviations to mask the fact they are advertising controlled substances for sale because if it were obvious in the posting of what they are selling there is a chance Instagram will remove the post and/or block their account.

 

101)     The CI also stated that ALANIS posted on May 8, 2025, a photo of a large quantity of marijuana and then on May 12, 2025, posted "Will have 800$ mid in a little bit" (pictured below). It should be noted that this post also included a plug emoji at the end of the sentence. Based off my training and experience "mid" is slang for a type of marijuana and the

plug emoji is to represent the word "plug" which is slang for an individual who supplies someone with controlled substances. The CI also explained that ALANIS posted on his Instagram story a picture of a car dashboard that the CI believed was the same car dashboard as SILVA-ALVAREZ's Explorer. The CI attempted to show ATF and WPD the photo however the photo was no longer on ALANIS's Instagram story. Based on training and experience I know that Instagram has a feature that allows photos to disappear after a certain time when posted as a story.



102) For the above reasons, there is probable cause to believe that ALANIS has committed felony violations of 18 U.S.C. § 922(o) (Unlawful possession of Machinegun), 18 U.S.C. § 371 (Conspiracy to Violate the laws of the United States), 21 U.S.C. § 841 (distribution of controlled substances) and 26 U.S.C. § 5861(a) (Engaging in the Business of Dealing in NFA Firearms) and that the location information described in Attachment B will assist law enforcement in confirming ALANIS'S activities, and location in order to prove ALANIS is involved in the

61

illegal possession of machineguns and illegal dealing of machineguns and will assist Law Enforcement in executing future warrants related to ALANIS.

103)    In my training and experience, I have learned that the Service Provider is a company that provides cellular communications service to the general public. I also know that providers of cellular communications service have technical capabilities that allow them to collect and generate information about the locations of the cellular devices to which they provide service, including cell-site data, also known as "tower/face information" or "cell tower/sector records." Cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular device and, in some cases, the "sector" (i.e., faces of the towers) to which the device connected. These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas. Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device. Accordingly, cell-site data provides an approximate general location of the cellular device.

## CELL-SITE DATA

104)    Based on my training and experience, I know that Service Providers can collect cell-site data on a prospective basis about the Target Cellular Devices. Based on my training and experience, I know that for each communication a cellular device makes, its wireless service provider can typically determine: (1) the date and time of the communication; (2) the telephone numbers involved, if any; (3) the cell tower to which the customer connected at the beginning of the communication; (4) the cell tower to which the customer was connected at the end of the communication; and (5) the duration of the communication. I also know that wireless providers such as the Service Providers typically collect and retain cell-site data pertaining to cellular

devices to which they provide service in their normal course of business in order to use this information for various business-related purposes.

105)     Based on my training and experience, I know that the Service Providers can collect per-call measurement data, which the Service Providers also refer to as the "real-time tool" ("RTT"). RTT data estimates the approximate distance of the cellular device from a cellular tower based upon the speed with which signals travel between the device and the tower. This information can be used to estimate an approximate location range that is more precise than typical cell-site data.

106)     Based on my training and experience, I know that Verizon also can collect per-call measurement data, which Verizon also refers to as the "real-time tool" ("RTT"). RTT data estimates the approximate distance of the cellular device from a cellular tower based upon the speed with which signals travel between the device and the tower. This information can be used to estimate an approximate location range that is more precise than typical cell-site data.

## E-911 PHASE II / GPS LOCATION DATA

107)     I know that some providers of cellular telephone service have technical capabilities that allow them to collect and generate E-911 Phase II data, also known as GPS data or latitude-longitude data. E-911 Phase II data provides relatively precise location information about the cellular telephone itself, either via GPS tracking technology built into the phone or by triangulating on the device's signal using data from several of the provider's cell towers. As discussed above, cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular telephone and, in some cases, the "sector" (i.e., faces of the towers) to which the telephone connected. These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas.

63

Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device. Accordingly, cell-site data is typically less precise that E-911 Phase II data. Based on my training and experience, I know that the Service Providers can collect E-911 Phase II data about the location of the Target Cellular Devices, including by initiating a signal to determine the location of the Target Cellular Devices on the Service Providers' network or with such other reference points as may be reasonably available.

## PEN-TRAP DATA

108)　Based on my training and experience, I know each cellular device has one or more unique identifiers embedded inside it. Depending on the cellular network and the device, the embedded unique identifiers for a cellular device could take several different forms, including an Electronic Serial Number ("ESN"), a Mobile Electronic Identity Number ("MEIN"), a Mobile Identification Number ("MIN"), a Subscriber Identity Module ("SIM"), a Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"), an International Mobile Subscriber Identifier ("IMSI"), or an International Mobile Equipment Identity ("IMEI"). The unique identifiers – as transmitted from a cellular device to a cellular antenna or tower – can be recorded by pen-trap devices and indicate the identity of the cellular device making the communication without revealing the communication's content.

## SUBSCRIBER INFORMATION

109)　Based on my training and experience, I know that wireless providers such as the Service Providers typically collect and retain information about their subscribers in their normal course of business. This information can include basic personal information about the subscriber, such as name and address, and the method(s) of payment (such as credit card account number) provided by the subscriber to pay for wireless communication service. I also know that wireless

64

providers such as the Service Providers typically collect and retain information about their subscribers' use of the wireless service, such as records about calls or other communications sent or received by a particular device and other transactional records, in their normal course of business. In my training and experience, this information may constitute evidence of the crimes under investigation because the information can be used to identify the Target Cellular Devices' user or users and may assist in the identification of co-conspirators and/or victims.

## AUTHORIZATION REQUEST

110)    Based on the foregoing, I request that the Court issue the proposed search warrant, pursuant to Federal Rule of Criminal Procedure 41 and 18 U.S.C. § 2703(c). The proposed warrant will also function as a pen register order under 18 U.S.C. § 3123 authorizing the installation and use of a pen register and/or trap and trace device to record, decode, and/or capture certain information in Attachment A for each communication to or from the Target Cellular Device, without geographic limit, for a period of thirty (30) days pursuant to 18 U.S.C. § 3123(c)(1).

111)    I further request, pursuant to 18 U.S.C. § 3103a(b) and Federal Rule of Criminal Procedure 41(f)(3), that the Court authorize the officer executing the warrant to delay notice until 30 days after the collection authorized by the warrant has been completed. There is reasonable cause to believe that providing immediate notification of the warrant may have an adverse result, as defined in 18 U.S.C. § 2705. Providing immediate notice to the subscriber or user of the Target Cellular Device would seriously jeopardize the ongoing investigation, as such a disclosure would give that person an opportunity to destroy evidence, change patterns of behavior, notify confederates, and flee from prosecution.  *See* 18 U.S.C. § 3103a(b)(1). As further specified in Attachment B, which is incorporated into the warrant, the proposed search warrant does not

65

authorize the seizure of any tangible property. *See* 18 U.S.C. § 3103a(b)(2). Moreover, to the extent that the warrant authorizes the seizure of any wire or electronic communication (as defined in 18 U.S.C. § 2510) or any stored wire or electronic information, there is reasonable necessity for the seizure for the reasons set forth above. *See* 18 U.S.C. § 3103a(b)(2).

112)　I further request that the Court direct Verizon to disclose to the government any information described in Attachment B that is within the possession, custody, or control of Verizon. I also request that the Court direct Verizon to furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the information described in Attachment B unobtrusively and with a minimum of interference with Verizon's services, including by initiating a signal to determine the location of the Target Cellular Device on Verizon's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government shall reasonably compensate Verizon for reasonable expenses incurred in furnishing such facilities or assistance.

113)　I further request that the Court authorize execution of the warrant at any time of day or night, owing to the potential need to locate the Target Cellular Device outside of daytime hours.

66

# **ATTACHMENT A**

**Property to Be Searched**

1. Records and information associated with the cellular device assigned (385) 466-7398 (referred to herein and in Attachment B as "the Target Cellular Device") that is in the custody or control of Verizon (referred to herein and in Attachment B as the "Service Provider" or the "Provider"), a wireless communications service provider that is located at 180 Washington Valley Road, Bedminster NJ.

2. The Target Cellular Device.

# ATTACHMENT B

## Particular Things to Be Seized from Device Service Provider

To the extent that the information described in Attachment A is within the possession, custody, or control of the Provider, including any information that has been deleted but is still available to the Provider or that has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), the Provider is required to disclose to the government the following information pertaining to the Account listed in Attachment A:

a. The following subscriber and historical information about the customers or subscribers associated with the Target Cellular Device for the time period January 1, 2024, to PRESENT:

    i. Names (including subscriber names, user names, and screen names);

    ii. Addresses (including mailing addresses, residential addresses, business addresses, and e-mail addresses);

    iii. Local and long distance telephone connection records;

    iv. Records of session times and durations, and the temporarily assigned network addresses (such as Internet Protocol ("IP") addresses) associated with those sessions;

    v. Length of service (including start date) and types of service utilized;

    vi. Telephone or instrument numbers (including MAC addresses, Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifier ("MEID"); Mobile Identification Number ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"); International Mobile Subscriber Identity Identifiers ("IMSI"), or International Mobile Equipment Identities ("IMEI");

    vii. Other subscriber numbers or identities (including the registration Internet Protocol ("IP") address);

    viii. All subscriber and extended subscriber information, handset identifiers, handset make and model, WI-FI MAC address, and account notes and

2

memos pursuant to Federal Rule of Criminal Procedure 41 and 18 U.S.C. §2703(c).

ix. Means and source of payment for such service (including any credit card or bank account number) and billing records; and

x. All records and other information (not including the contents of communications) relating to wire and electronic communications sent or received by the Target Cellular Device, including:

(A) Call detail records and data reports with cell site location information for voice, SMS, MMS, and data connections, originating and destination IP addresses, and specialized location data including timing advance, RTT, LOCDBOR, or equivalent pursuant to Federal Rule of Criminal Procedure 41 and 18 U.S.C. §2703(c); and

(ii) information regarding the cell tower and antenna face (also known as "sectors" through which the communications were sent and received)

b. Information associated with each communication to and from the Target Cellular Device for a period of 30 days from the date of this warrant, including:

i. Any unique identifiers associated with the cellular device, including ESN, MEIN, MSISDN, IMSI, SIM, or MIN;

ii. Source and destination telephone numbers;

iii. Date, time, and duration of communication; and

iv. All data about the cell towers (i.e. antenna towers covering specific geographic areas) and sectors (i.e. faces of the towers) to which the Target Cellular Device will connect at the beginning and end of each communication

The Court has also issued an order pursuant to 18 U.S.C. § 3123, dated today, for such information associated with the Target Cellular Device.

c. Information about the location of the Target Cellular Device for a period of 30 days, during all times of day and night. "Information about the location of the Subject Phone" includes all available E-911 Phase II data, GPS data, latitude-longitude data, and other precise location information.

i. To the extent that the information described in the previous paragraph (hereinafter, "Location Information") is within the possession, custody, or

3

control of the Provider, the Provider is required to disclose the Location Information to the government. In addition, the Provider must furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the Location Information unobtrusively and with a minimum of interference with the Provider's services, including by initiating a signal to determine the location of the Target Cellular Device on the Provider's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government shall compensate the Provider for reasonable expenses incurred in furnishing such facilities or assistance.

ii. Information about the target cellular device and its location, later referred to collectively as location information, includes all precision location information, E-911 Phase II data, GPS data, latitude-longitude data, specialized location data including timing advance, RTT, LOCDBOR, or equivalent, and real time cell site information for 30 days beginning from the date the warrant was issued. This includes initiating a signal to determine the location of the Target Cellular Device on the service provider's network or with such other reference points as may be reasonably available and at such intervals and times directed by the government. The information includes monitoring non-content signaling and routing information, including all non-content packet switched data, through the furnishing of information, facilities, technical assistance, and the installation and use of a pen register and trap and trace device pursuant to 18 U.S.C. §§ 3123-3124 by the service provider and the Federal Bureau of Investigation. Because the request for such location data may include use of a "pen register" or a "trap and trace device," see 18 U.S.C. § 3127(3) & (4), the application and the warrant are designed to comply with the Pen Register Statute as well as Rule 41. The application therefore includes all information required for and serves as a pen register application, 18 U.S.C. § 3123(a); similarly, the warrant therefore includes all the information required for and serves as a pen register order, 18 U.S.C. § 3123(b).

iii. This pen register / trap and trace device shall be transferable to any changed dialed number subsequently assigned to a device bearing the same ESN, IMSI, or SIM as the Target Cellular Device; any changed ESN, IMSI, or SIM subsequently assigned the same dialed number as the Target Cellular Device; or any additional changed dialed number, ESN, IMSI, or SIM listed to the same subscriber account as the Target Cellular Device.

d. The government shall compensate the service provider for reasonable expenses incurred in furnishing such facilities or assistance. Any service provider or

4

representative who gains access to the information in this warrant shall not disclose the existence of the warrant, order, or investigation to any third party unless ordered to do so by the Court. Additionally, the agency requests that all court orders and supporting documents, including the affidavit and search warrant, be sealed until further order by the Court.

e.  This warrant does not authorize the seizure of any tangible property. In approving this warrant, the Court finds reasonable necessity for the seizure of the Location Information. *See* 18 U.S.C. § 3103a(b)(2).

## II.     Information to be Seized by the Government

All information described above in Section I that will assist in the investigation of (385)-466-7398 regarding violations of 18 U.S.C. § 922(o) (Unlawful possession of Machinegun), 26 U.S.C. § 5861(a) (Engaging in the Business of Dealing in NFA Firearms), 21 U.S.C. § 841 (distribution of controlled substances) and 18 U.S.C. § 371 (Conspiracy to Violate the laws of the United States) between January 1, 2024, and the present.

Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) are authorized to review the records produced by the Provider in order to locate the things particularly described in this Warrant.

5